```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


TDATA, Inc., an Ohio corporation, :

        Plaintiff,                :

    v.                            :     Case No. 2:03-cv-0264

Aircraft Technical Publishers,    :     JUDGE FROST
a California corporation,
                                  :
        Defendant,
                                  :
    and
                                  :
Aircraft Technical Publishers,
                                  :
        Plaintiff,
                                  :
    v.                                  Case No. 2:04-cv-1072
                                  :
TDATA, Inc.,                            JUDGE FROST
                                  :
        Defendant.
```

OPINION AND ORDER

This case is before the Court to consider two motions which relate primarily to discovery, but which also raise a subsidiary issue concerning the continued participation of Attorney William Milks, one of the attorneys for Aircraft Technical Publishers, in the litigation aspects of this case.  For the following reasons, the Court grants ATP's request for additional discovery and denies Tdata's request that the protective order in this case be modified to prevent Mr. Milks from reviewing confidential attorneys-eyes-only documents.  The discovery schedule and motions cutoff date will also be slightly modified to reflect the fact that additional discovery is being ordered.

I.

The current dispute began when ATP filed a motion to compel on September 9, 2005.  The motion to compel raised a number of discovery-related issues, most of which related to Tdata's failure, despite earlier commitments, to produce all of the documents in its possession responsive to a variety of document requests which had been propounded by ATP.  The documents which had not been produced included email records, prior art relating to the patents-in-suit, documents relating to ATP's software, electronically-searchable forms of documents previously produced in non-searchable form, an insurance policy, certain survey information, board or shareholder minutes, and a transcript of a taped telephone conversation.  The motion also requested that Tdata be ordered to produce additional 30(b)(6) witnesses and that costs and sanctions be imposed.

In its reply, Tdata asserted that it was still in the process of providing responsive documents to many of the document requests.  However, it asserted that it was going to withhold certain documents, which it believed should be designated as attorneys-eyes-only under the existing protective order agreed to between the parties, until the Court ruled on a forthcoming motion to modify that protective order.  The motion to modify the protective order has now been filed.  According to Tdata's memorandum contra to the motion to compel, and its motion to modify the protective order, it is no longer appropriate for Attorney William Milks to see attorneys-eyes-only documents because Mr. Milks is also involved in prosecuting additional patent applications on behalf of ATP.  Tdata asserts that the information which it intends to produce under the attorneys-eyes-only designation could be used by ATP in that process and that Mr. Milks should therefore be prohibited from seeing that information.

After a reply memorandum was filed in support of the motion to compel, the Court conducted a telephone status conference with counsel. During that status conference, Tdata represented that it had produced most of the additional documentation it had agreed to produce. However, in addition to withholding some information because of the issue related to Mr. Milks, Tdata had also not produced the transcript of the telephone conversation, a searchable electronic version of the customer information previously produced, and its Quickbooks financial database. During the status conference, Tdata was directed to determine whether it was in possession of a searchable electronic database related to customer information and, if so, to produce that electronic version as soon as possible. A ruling on other issues was reserved until the motion to modify the protective order was fully briefed. That briefing has now been completed, and the Court is in a position to make the necessary rulings.

II.

The Court will deal first with a relatively simple issue. According to the parties, a telephone conversation between Mr. Thomas, a principal of Tdata, and a principal of ATP was taped by Mr. Thomas. A transcript of the conversation was then prepared. Tdata has withheld the transcript on work product grounds. It asserts in its opposing memorandum (although there is no affidavit to this effect) that counsel for Tdata directed a secretary to transcribe the tape for his use and that "[t]he transcription is not complete, contains errors and blanks, some notes, and is to be used solely as a working document for Tdata's counsel." Tdata's Memorandum Contra, at 6.

Assuming the statements contained in Tdata's opposing memorandum to be true, the transcript is not producible. ATP is correct that a transcript of a tape recording which is itself discoverable is ordinarily not work product as long as the

transcript was prepared simply as an accurate rendition of the conversations on the tape.  <u>Riddell Sports v. Brooks</u>, 158 F.R.D. 555 (S.D.N.Y. 1994).  The same cannot be said, however, of a transcript which is prepared by litigation counsel's secretary for counsel's use and which contains attorney's notes.  Obviously, such a document was prepared in anticipation of litigation and the notes may reflect attorney impressions as well.  Because Tdata has offered to produce not only a CD recording of the telephone conversation but an actual tape recording, which appears to be the equivalent of the recording used by Tdata's counsel to prepare the transcript, ATP may similarly prepare its own transcript from that same recording.  Consequently, the Court will not direct the production of the transcript.

III.

Another issue which appears to be separate from the issue of the modification of the protective order relates to accounting entries made in Tdata's Quickbooks system.  Although Tdata has produced other financial information, it argues that the Quickbooks information is simply duplicative.  ATP asserts, however, that the Quickbooks information contains underlying accounting data not available in the documents already produced and that it is pertinent to the damage claims asserted in this case.  Tdata does not appear to controvert that latter assertion.

Even if Tdata is correct that it has already produced this data in other forms (an assertion which the Court cannot credit given the lack of a factual foundation for that assertion), much discovery is, by its nature, somewhat duplicative.  The courts have consistently held that various discovery devices can be used to get at the same subject in order fully to test the factual basis for the opposing party's claims or to discover the factual predicate for a claim being asserted by the party requesting

4

discovery.  See, e.g., Tri-State Hospital Supply Corp. v. United States, 226 F.R.D. 118, 126 (D.D.C. 2005) ("[b]y its very nature, the discovery process entails asking witnesses questions about matters that have been the subject of discovery....[H]ow [the events at issue] occurred is a topic that may be pursued by all forms of discovery, even though the information provided by one form of discovery repeats and duplicates information yielded by another").  Thus, both because there is a substantial probability that the Quickbooks information differs from other financial information produced, and because a party is entitled to use discovery to obtain relevant documentation, whether duplicative or not, Tdata will also be directed to produce the requested Quickbooks information.

IV.

The Court now turns to the question of whether the issue raised by Tdata concerning Mr. Milks should act as a further barrier to discovery.  In order to answer that question, some additional factual background is needed.

Tdata filed its Motion to Modify Protective Order on October 7, 2005.  The Motion and accompanying memorandum in support requests this Court to modify the existing August 16, 2004 protective order, which now permits attorneys-eyes-only material to be viewed by, *inter alia*, "outside attorneys of record in this case...." Although the protective order also provides that such information may be used only for purposes of the litigation, Tdata has asked that it be modified to read:

> Information designated as "Confidential" or "Attorneys' Eyes Only" shall be regarded as Patent Prosecution Information.  The substance or content of any Patent Prosecution Information, as well as notes, abstracts, copies, summaries and memoranda relating thereto shall not be disclosed to or be accessible to anyone who assists or participates in the application for or

5

>   prosecution of patents for computer aided
>   maintenance and repair systems for equipment
>   subject to regulatory compliance.
>
>   No attorney who represents or assists in the
>   representation of a party in the present
>   actions pending before this Court shall
>   assist or participate in the application for
>   or prosecution of patents for computer aided
>   maintenance and repair systems for equipment
>   subject to regulatory compliance throughout
>   the duration of this lawsuit and any appeals,
>   and for one year after the conclusion of
>   their lawsuit and any appeals.
>
>   No attorney who represents or assists or who
>   has represented or assisted in the
>   application for or prosecution of patents for
>   computer aided maintenance and repair systems
>   for equipment subject to regulatory
>   compliance shall appear as counsel or
>   otherwise assist in the actions currently
>   pending before this Court, and the appeals
>   which may follow therefrom.

Motion to Modify Protective Order at p. 1-2.

ATP's counsel William Milks and his firm, Russo & Hale, are "outside attorneys" within the meaning of the existing protective order.  Through the course of this litigation, Mr. Milks has reviewed certain documents belonging to Tdata which were designated as attorneys-eyes-only under the current protective order.  According to Tdata, in August 2005, ATP produced thousands of pages of documents.  Some of them allegedly reveal that ATP subscribed to Tdata's products under false pretenses and violated Tdata's licensing agreement.  Tdata claims that ATP obtained a new patent with this information, which is a derivative of the three patents in dispute in the present case. Mr. Milks and Russo & Hale are the patent attorneys of record in the prosecution of the new derivative patent.

These actions, assuming they occurred as described by Tdata,

do not violate the protective order. However, Tdata argues that ATP has demonstrated through this allegedly improper course of conduct that it will misuse Tdata's confidential information in the patent process. Tdata therefore claims that it is justified in withholding the additional discovery at issue here until the protective order specifically provides that such information cannot be disclosed to patent counsel, i.e. Mr. Milks, for fear that he will either disclose it to ATP or use it to prosecute additional patents, both of which would be violations of the existing protective order.

U.S. Steel Corp. v. United States, 730 F.2d 1465 (D.C. Cir. 1984) appears to be the leading case which addresses the potential, created by a protective order such as the one now in force in this case, that an attorney who both litigates patent infringement cases and prosecutes patents might inadvertently or accidentally disclose confidential patent information to the client. See, e.g., Brown Bag Software v. Symantec, 960 F.2d 1465 (9th Cir. 1992); Medtronic, Inc. v. Guidant Corp., Nos. Civ.00-1473(MJD/JGL) and Civ.00-2503(MJD/JGL), 2001 WL 34784493 (D.Minn. Dec. 20, 2001); Volvo Penta of the Americas v. Brunswick Corp., 187 F.R.D. 240 (E.D. Va. 1999). At issue in U.S. Steel was whether a bright-line rule should be adopted that would prohibit "in-house" counsel who is also litigation counsel from having access to the opposing side's confidential patent information. There, the Court of International Trade had restricted U.S. Steel's in-house counsel's access to confidential information produced during the course of a proceeding before the International Trade Commission based not on any evidence that the information would be misused, but upon the potential for misuse that existed whenever in-house counsel is permitted to view a competitor's sensitive business information.

In reversing the CIT's decision, the court declined to adopt

such an absolute standard and held that access to confidential information "should be denied or granted on the basis of each individual counsel's actual activity and relationship with the party represented, without regard to whether a particular counsel is in-house or retained." Id. at 1469.  Furthermore, the court noted that "status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access." Id. Rather, the court opined that "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure." Id. at 1468.  Specifically, the key inquiry is whether the attorneys in question are involved in competitive decision-making with their client. Id. at n. 3.  Competitive decision-making is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." Id. Finally, the Court considered the hardship to the party whose attorneys are denied access to the confidential information. Id. at 1469 ("forcing USS to rely on newly retained counsel would create an extreme and unnecessary hardship.")

    This type of specific factual inquiry has been approved by other courts.  For example, in Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir. 1992), Brown Bag sued Symantec for copyright and trademark infringement.  At the beginning of the lawsuit, Brown Bag retained outside counsel and all parties stipulated to certain measures designed to protect trade secrets in discovery.  After nearly one year of litigation, Brown Bag's retained counsel withdrew and Brown Bag's newly hired in-house

counsel entered his appearance on behalf of Brown Bag. Symantec moved for a protective order restricting access of Brown Bag's in-house counsel to documents labeled "attorneys' eyes only" under the previous discovery stipulation. A hearing was held and the district court issued a protective order that required Symantec's confidential information to be filtered through an independent consultant before being turned over to Brown Bag's in-house counsel. Id. The court stated at the hearing that "if [it] is the opinion of the outside consultant that in house counsel needs [certain] material in order to pursue the litigation, then there has to be a very specific request...back to the court for the items that are deemed to be necessary." Id.

The Court of Appeals for the Ninth Circuit, relying on U.S. Steel, held that a protective order that shielded plaintiff's in-house counsel from personal knowledge of defendant's trade secrets but allowed access to information through an independent consultant was not an abuse of discretion. The Court stated:

> Brown Bag's counsel did not dispute the dangers inadvertent disclosure posed to Symantec. Instead, Brown Bag's counsel reassured the magistrate that the professional integrity of in-house counsel and his promise to store the trade secret documents in a locked file cabinet in his Brown Bag office sufficiently protected Symantec from inadvertent disclosure.
>
> The magistrate expressly credited in-house counsel's integrity and good faith. The magistrate had to consider, however, not only whether the documents could be locked up in cabinets, but also whether Brown Bag's counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure to his employer once he had read the documents. As the *U.S. Steel* court suggested, the magistrate therefore inquired into counsel's responsibilities as Brown Bag's sole legal advisor and personnel manager. ***

9

> From this testimony, the magistrate reasonably concluded that Brown Bag's counsel's employment would necessarily entail advising his employer in areas relating to Symantec's trade secrets. Knowledge of Symantec's trade secrets would place in-house counsel in the "untenable position" of having to refuse his employer legal advice on a host of contract, employment, and competitive marketing decisions lest he improperly or indirectly reveal Symantec's trade secrets.

Id. at 1471. Finally, the Court examined the hardship a protective order might impose on Brown Bag and concluded that because Brown Bag's former counsel had over six months to study the trade secrets, limiting the new in-house counsel's exposure to the confidential information, given the pending summary judgment deadline, was reasonable.

A district court reached a similar conclusion in Motorola v. Interdigital Technology Corp., No. Civ.A. 93-488-LON, 1994 WL 16189689 (D. Del. Dec. 19, 1994), a case relied on by Tdata. In Motorola, the district court reviewed whether it should limit the discovery of confidential information by Interdigital's attorneys due to the high risk of inadvertent disclosure because of Interdigital's attorneys' dual role as both the litigation attorney and the patent prosecutor. In doing so, the Motorola court examined, *inter alia*, the factors annunciated in U.S. Steel, namely inadvertent disclosure and the hardship to the client. Id. at *4 and *5.

In examining the risk of inadvertent disclosure, the court balanced the current roles of the attorneys involved in the case against the amount of confidential information that those attorneys would be privy to if allowed full access to discovery. The court stated:

> [The attorneys in question are] currently prosecuting applications relating to the very patents at issue in this litigation.

10

>Attorneys who were to view Motorola's voluminous confidential information and then later prosecute the patents would have to constantly challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped "untainted", another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the...attorneys may be.

Id. at *5. Moreover, the court examined the hardship and difficulties posed to Interdigital if a protective order was granted that limited their attorneys from reviewing all the relevant discovery. The court concluded:

>It is important to note that [Interdigital's counsel] has not been prosecuting these particular ITC patent applications for a long period of time. This is not a situation where a client decided that it would be efficient to retain trial counsel, who had prosecuted the particular patent in the past. In fact, [Interdigital's counsel] did not become attorney of record for these particular patent applications until one week after the filing of Motorola's suit. This creates the appearance of a situation where a client felt it would be efficient to have trial counsel prosecute the patent application in the future. This creates far too great a risk that any efficiency will be to some extent the result of inadvertent use of confidential information.

Id.

In In re Sibia Neurosciences, Inc., No. 525, 1997 WL 688174 (Fed. Cir. 1997), Sibia sought to prohibit confidential information concerning its pending patent applications and research from being disclosed to outside counsel for Cadus Pharmaceutical Company. The attorney in question, Mr. DeConti, indicated that he was actively involved in both patent litigation

11

and in the prosecution of patents on behalf of Cadus. Mr. DeConti informed both Sibia's trial counsel and the district court that the particular research area involved in the patent dispute, i.e. cell surface receptors and protein and assay methods, was one of wide-ranging applicability and that his law firm represented more than 50 different clients in patent prosecution matters in the biotechnology area. Moreover, Mr. DeConti stated that in his patent prosecution work for Cadus, he generally would file the patent application after market decisions had already been made by Cadus.

Based on this testimony, Sibia sought a protective order that would prohibit its trade secrets from being viewed by anyone who prosecuted patent applications relating to cell surface receptors or proteins and assay methods, and which would prohibit anyone who did review its confidential information from prosecuting such patent applications. The magistrate judge agreed with Sibia and granted its requested protective order. On review, the district court concluded that the magistrate judge's decision was contrary to law and allowed access to confidential information to all of Cadus' outside counsel involved in the litigation, including Mr. DeConti.

The Court of Appeals for the Federal Circuit affirmed. Relying on U.S. Steel, the court stated:

> Indeed, as we noted in an analogous case addressing the meaning of the term "competitive decisionmaking," "the standard is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'"
>
> The district court's order was well reasoned and discussed the relevant facts....Specifically, the district court found that there was no evidence that Cadus's

> outside counsel, particularly Mr. DeConti,
> was involved in competitive decisionmaking.
> The district court: also [sic] noted that the
> magistrate judge's reliance on Mr. DeConti's
> inability to guarantee absolute assurance of
> nondisclosure by Cadus's outside counsel was
> in error.  Moreover, the district court held
> that denying access to Cadus's outside
> counsel would pose a serious and unnecessary
> hardship, especially because Mr. DeConti had
> been Cadus's patent counsel for more than one
> year prior to the commencement of the patent
> action and because the testimony at the
> hearing before the magistrate judge reflected
> Mr. DeConti's crucial role in the patent
> litigation.

Id. at **3 (internal citations omitted).

In the instant case, the status of Mr. Milks and his colleagues at Russo & Hale as "in-house" or "outside" counsel is irrelevant in this Court's evaluation of the risk to Tdata of inadvertent disclosure or misuse of its trade secrets by ATP. Rather, this Court must base its decision on the factual circumstances surrounding Mr. Milks' representation of ATP. Based on U.S. Steel and the other cases cited, *supra*, this Court must explore his involvement in competitive decision-making and must also examine the hardship visited upon ATP were the Court to modify the protective order.

The Court looks first to the affidavit submitted by Mr. Milks to determine his role in advising ATP.  The affidavit states, in relevant part, that Mr. Milks has "been prosecuting patents for ATP since at least 1992."  Declaration of William C. Milks, III in Support of Opposition to "Motion To Modify Protective Order" at ¶2.  Furthermore, the affidavit states:

> In handling numerous patent applications for
> multiple clients, I am well familiar with the
> need to "compartmentalize" information I
> receive from such disparate clients.  I am
> often faced with the issue of having

13

information from one client that could arguably benefit the patent application process for another client. At no time have I been unable to fulfill my duties of confidentiality in that regard, however.

I am the named patent attorney on the patents-in-suit in this action. I am informed and believe that Tdata has been aware of my involvement in prosecuting those patents at least since 2002 when it was notified of those patents. Tdata must also have known my involvement in this litigation as well, since dating back to 2003 I have corresponded with Tdata on behalf of ATP regarding several of the patents-in-suit, and I have been listed on numerous pleadings or discovery documents filed or served in this action.

As noted above, I have assisted ATP in prosecuting patents since at least 1992. During that time, however, and continuing to present, the following facts are true:

I have never been on the board of directors of ATP, or been an employee or officer thereof; I know of no instance where any ATP employee worked for my firm, Russo & Hale LLP, or vice versa;

I have never been involved with ATP regarding how they should design or develop their products, including based upon receiving information about any third-party products, be they Tdata's or some other company's;

I have never been involved with ATP regarding its pricing strategies or decisions;

I have never been involved with ATP regarding its marketing research, or research about competitors;

I have never been involved with ATP regarding any competitive decisions;

The products related to the patents I have

>prosecuted for ATP were released years ago, and were on the market years before the infringing Tdata products;
>
>I have been actively involved in this litigation; I am currently working diligently on issues such as expert reports and dispositive motions.
>
>I am aware of no other patent counsel that ATP has used since 1992. I am aware of no other patent counsel that ATP could hire to step into my shoes for purposes of this litigation, and even if there were such counsel, he/she would be unable to get up to speed concerning the issues in this case in time to allow ATP to adequately prepare for trial, or prepare expert reports or dispositive motions.
>
>\*\*\*
>
>On July 15, 2005, I participated with other ATP counsel in a lengthy meet and confer telephone call with counsel for Tdata.... Numerous outstanding discovery disputes were addressed during that call. In particular, [Tdata's counsel] insisted that I as patent counsel for ATP prepare detailed claim charts showing how ATP claimed that Tdata was infringing the patents-in-suit. I informed them that in order to be able to prepare such claim charts, Tdata would need to produce additional information about the Tdata products, which [Tdata's counsel] said Tdata would do, and did thereafter do.

Id. at ¶¶3-6 and 8.

It appears from a review of Mr. Milks' affidavit that Mr. Milks is not in any way involved in competitive decision-making, which is the crucial activity creating a high risk of inadvertent disclosure. First, while Mr. Milks' longstanding legal representation of ATP may involve regular contact with ATP corporate officials who make policy or even competitive

decisions, Mr. Milks' involvement is not related to activities such as giving advice regarding or participating in pricing or product design. In fact, Mr. Milks specifically states he was never involved in formulating pricing strategies or marketing decisions.

Second, Mr. Milks states that he has never served on the board of directors at ATP, which, if he had, certainly would have made his task of compartmentalizing more difficult. Similarly, Mr. Milks is not ATP's in-house counsel, which, given knowledge of Tdata's trade secrets, would place him in the untenable position of having to refuse his employer legal advice on a host of contract, employment, and competitive marketing issues lest he improperly or indirectly reveal Tdata's trade secrets. See, Brown Bag, 960 F.2d at 1471.

Third, Mr. Milks claims that he is the only patent attorney representing ATP and has been so since 1992. Moreover, Mr. Milks claims that he represents several clients and deals with compartmentalization on a regular basis. While it may be difficult sometimes to differentiate between what ideas originated with competitors as opposed to the clients themselves, Mr. Milks' continual experience with ATP, coupled with his non-existent involvement in pricing, marketing, and development strategies, reasonably reduces the risk of inadvertent disclosure in this particular situation. In sum, based on what the record reveals concerning Mr. Milks' scope of representation of ATP, this Court cannot conclude that he is involved in competitive decision-making.

Next, this Court examines the hardship placed on ATP if Mr. Milks is prohibited from viewing information within the proposed amended protective order. Mr. Milks has been patent counsel for ATP for over thirteen years and counsel in this case since 2002. In Sibia, the Court of Appeals affirmed the lower court's

16

determination that denying access to Cadus' outside counsel was error because that "would pose a serious and unnecessary hardship, especially because Mr. DeConti had been Cadus's patent counsel for more than *one year* prior to the commencement of the patent action...." Sibia, 1997 WL 688174 at **3 (emphasis added). Obviously, the hardship in this case would be much greater. Moreover, unlike the situation presented in Motorola, Mr. Milks' has consistently been prosecuting patent applications for ATP, whereas the attorney in that case had not yet been involved in such activity. See, Motorola, 1994 WL 16189689 at *5. Finally, given Tdata's knowledge that Mr. Milks has been involved in this case since 2002, coupled with Tdata's ability to discern whether Mr. Milks is also involved with ATP's patent prosecutions, this Court concludes that the issue should have been raised earlier and the delay adds to the potential to visit hardship on ATP if the motion were granted. See, Brown Bag, 960 F.2d at 1471.

In its reply memorandum, Tdata asserts that the U.S. Steel decision reflects a rule that is followed by only one court, and that numerous unreported district court decisions across the country support its view that Mr. Milks ought not to be permitted to view its confidential information while prosecuting derivative patent applications. Those assertions are unavailing.

First, most, if not all, of the decisions cited by Tdata actually cite U.S. Steel with approval, and follow that decision's method of analysis. The different result reached in those cases is based upon a fact situation that differs from that before the U.S. Steel court and not a different mode of analysis. In fact, most of those decisions reiterate the key concept that restriction of information from patent counsel is not to occur as a matter of course, but depends upon the level of involvement that patent counsel has in the decision-making that goes into the patent prosecution.

17

Second, the facts in those cases do not closely resemble the facts here beyond the obvious similarity that each is a case which involves an attorney who wishes both to prosecute patents and have access to confidential information produced in discovery. For example, in <u>Mikhon Gaming Corp. v. Acres Gaming</u>, 1998 WL 1059557 (D. Nev. April 15, 1998), the court held a hearing and concluded based on a much more fully-developed record that the particular patents being prosecuted would necessarily be affected by what patent counsel learned from discovery. Additionally, precluding that attorney from litigating was not a hardship because the attorney's client had been represented by other competent litigation counsel since the inception of the case. Such additional involvement in decision-making was also an element of the decision in <u>Interactive Coupon Marketing Group v. H.O.T! Coupons, LLC</u>, 1999 WL 618969 (N.D. Ill. Aug. 5, 1999), and both that case and <u>In re Papst Licensing</u>, 2000 WL 554219 (E.D. La. May 4, 2000) involved such a request at the early stages of the case where prejudice to the litigation posture of the client could be minimized. That is not the case here.

    Tdata also disputes that it knew that Mr. Milks was involved in prosecuting patents on behalf of ATP, and asserts that in prior discussions he never disclosed that involvement. There is no basis for concluding that he was obligated to do so, however, and little evidence of diligence on Tdata's part in determining if Russo & Hale were acting as patent counsel for ATP concurrent with the litigation of this case. Had that been a legitimate concern, it seems likely that Tdata would at least have made an inquiry about the subject prior to turning over the confidential material already produced, none of which appears to have been misused by ATP in any way. The date when the initial protective order was negotiated would have been an appropriate time to make that inquiry, especially in light of the frequency with which this issue has been discussed in the applicable case law, but such an inquiry was apparently not made at that or any other time

until the very last weeks of discovery, and only when it seems to have become clear to Tdata that it must actually produce all of the documents that ATP has been requesting almost since the outset of the litigation.  Thus, the Court sees no reason further to delay the production of the documents at issue or the completion of discovery.

V.

The final issue raised by the motion to compel is whether Tdata failed to comply with Fed.R.Civ.P. 30(b)(6) when it produced only Mr. Jim Thomas at the 30(b)(6) deposition of Tdata. Mr. Thomas, according to ATP, candidly admitted that there were others at Tdata who knew more about some of Tdata's software applications than he did.  Nevertheless, those other persons were not produced at the deposition.  Tdata asserts that Mr. Thomas was involved in developing the software and had sufficient knowledge to serve properly as the corporate representative at the 30(b)(6) deposition.

The Court understands from the last telephone conference held with counsel that ATP will depose additional Tdata representatives after the last group of documents are produced. Hopefully, any gaps in Mr. Thomas's knowledge will be filled in at that time.  If not, the parties should attempt to resolve the issue either by arranging for additional depositions or contacting the Court.

VI.

Based on the foregoing, ATP's motion to compel (doc. #145) is granted in part and denied in part as set forth above. Tdata's motion to modify the protective order (doc. #156) is denied.  Tdata shall produce the documents it has withheld pending resolution of these motions by the close of business on Friday, October 21, 2005.  The discovery cutoff date and dispositive motions filing date are each extended by one week.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due ten days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.4.

/s/ Terence P. Kemp
United States Magistrate Judge