UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TDATA INC.**

       **Plaintiff,**                              **Case No. 2:03-cv-264**
                                               **JUDGE GREGORY L. FROST**
    **v.**                                              **Magistrate Judge Terence P. Kemp**

**AIRCRAFT TECHNICAL PUBLISHERS,**

       **Defendant.**


**AIRCRAFT TECHNICAL PUBLISHERS,**

       **Plaintiff,**                                **Case No. 2:04-cv-1072**
                                               **JUDGE GREGORY L. FROST**
    **v.**                                              **Magistrate Judge Terence P. Kemp**

**TDATA INC.**

       **Defendant.**

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings:

(1) a motion for summary judgment (Doc. # 99) filed by Aircraft Technical Publishers ("ATP"), a memorandum in opposition (Doc. # 112) filed by Tdata Incorporated ("Tdata"), and a reply (Doc. # 113) filed by ATP;[1] and

(2) a motion for summary judgment (Doc. # 130) filed by Tdata, a memorandum in opposition (Doc. # 138) filed by ATP, and a reply (Doc. # 151) filed by Tdata.

---

[1] For ease of reference, the Court shall refer to the document numbers in Case No. 2:03-cv-264. This Order of course relates to the corresponding documents filed in Case No. 2:04-cv-1072.

1

For the reasons that follow, the Court **GRANTS** ATP's motion for summary judgment (Doc. # 99) and **DENIES** Tdata's motion for summary judgment (Doc. # 130).

## I.  Background

In several prior Orders, this Court has described the nature and circumstances of this consolidated litigation.  For purposes of the record, the Court shall again briefly describe here the essential facts of this litigation.

Tdata Incorporated ("Tdata") is a company that produces and sells a software product called "Iapproach," which is a resource used for managing aircraft maintenance and repair. Aircraft Technical Publishers ("ATP") is the holder of three patents that are involved in these two consolidated cases.  The companies became embroiled in a dispute over these patents, and on March 27, 2003, Tdata filed case No. 2:03-cv-264 in this Court, seeking to invalidate two of the patents.  ATP filed a counterclaim asserting infringement of these same patents.

Various procedural developments ensued while ATP proceeded to file a second action–this one targeting the remaining third patent–in the United States District Court for the Northern District of California.  By then, the parties' dispute also encompassed alleged trademark infringement by Tdata.  Following much procedural maneuvering both in this Court and in the Northern District of California, which included an order of transfer that created case No. 2:04-cv-1072, both actions were eventually consolidated on this Court's docket before the undersigned judge.

In an effort to clarify and focus these proceedings, the Court permitted ATP to file an Amended Complaint on December 7, 2004.  (Doc. # 60.)  That amended pleading asserted four

claims: willful patent infringement, patent infringement, trademark infringement, and unfair competition. (Doc. # 60, at 5-11.) Tdata in turn filed a January 6, 2005 answer containing two counterclaims, the first of which asks for declaratory relief, while the second counterclaim asserts an antitrust violation asserting that ATP had violated antitrust laws by attempting to unlawfully restrain trade, by attempting to fix prices, and by attempting to enforce an invalid patent in an effort to create a monopoly. (Doc. # 66, at 9 ¶¶ 40-46.) ATP filed a reply to the counterclaims on January 21, 2005. (Doc. # 70.) The consolidated actions thus present three basic causes of action: patent infringement, trademark infringement, and antitrust. The motions with which this decision is concerned address, however, only the trademark infringement issues.[2]

The focus of this decision is thus three trademarks held by ATP for "ATP," "ATP Navigator," and "ATP Maintenance Director."[3] ATP asserts that Tdata has improperly used these trademarks on one or more Tdata websites–including using them as "metatags" and "title tags"[4] in the programming code of the sites, and without providing proper registration

---

[2] In regard to the antitrust issues, ATP has filed a separate motion for summary judgment on Tdata's counterclaim. (Doc. # 170.) The Court will issue a separate decision on that motion. In regard to the patent infringement issues, a *Markman* tutorial is set for January 25, 2006, to be followed by a *Markman* hearing on February 2, 2006. Summary judgment motions on the patent issues are due by June 2, 2006.

[3] "ATP" is actually a service mark, but given the nature of the mark, the Court shall join the parties in simply referring to the mark as a trademark. *See Savannah College of Art and Design, Inc. v. Houeix*, 269 F. Supp. 2d 929, 941 n.5 (citing 15 U.S.C. § 1127). ATP has restricted its motion to Tdata's use of that mark. (Doc. # 99, at 6 n.3.)

[4] The Sixth Circuit has offered the following definition for this term:

"A 'metatag' is a list of words hidden in a web site acting as an index or reference source identifying the content of the web site for search engines." J. Thomas McCarthy, *Trademarks and Unfair Competition* § 25:69 (4th ed.). Metatags have been "analogized to the subject index of a card catalog indicating

designation–which draws potential ATP customers to Tdata websites.[5]  According to ATP, this has created confusion over the ownership of the marks and constitutes unfair competition.  Both parties have moved for summary judgment, and with briefing complete, the motions are ripe for disposition.

---

the general subject of a book." *Id*.

*PACCAR Inc. v. Telescan Techs., L.L.C.*, 319 F.3d 243, 248 n.2 (6th Cir. 2003), *overruled in part on different grounds*, *KP Permanent Make-up, Inc. v.Lasting Impression I, Inc.*, 543 U.S. 111 (2004).  The parties also argue over the use of "ATP" as a title tag, which "is text that is used as the title of a web page in the listings of a crawler-based search engine." *Playboy Enterprises, Inc. v. Terri Welles, Inc.*, 78 F. Supp. 2d 1066, 1092 (S.D. Cal. 1999), *reversed in part on grounds apart from definition*, 279 F.3d 796 (9th Cir. 2002).  For ease of discussion, the Court shall simply focus on the term metatag, understanding that a title tag can also attract web surfers.

[5]  The Ninth Circuit Court of Appeals has explained the technology behind a web surfer's use of search terms, or keywords, on an Internet search engine to find a website:

> When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword.  Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.  Search engines look for keywords in places such as domain names, actual text on the web page, and metatags.  Metatags are HTML code intended to describe the contents of the web site.  There are different types of metatags, but those of principal concern to us are the "description" and "keyword" metatags.  The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site.  The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher on the list of "hits" the web page will appear.

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999) (citations omitted).  That same circuit court has also explained more recently that this system has changed over time, because "search engine algorithms [now] incorporate corporate dollars into their formulae.  Firms can pay the search engines in return for primary placement among the search results." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 945 n.10 (9th Cir. 2002).

## II.  Discussion

### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must therefore grant a motion for summary judgment here if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to his case.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52.)

### B.  Analysis

5

Inexplicably, neither the pleadings nor the briefing in this litigation identify the precise portions of the Lanham Act at the heart of this litigation. It appears that ATP asserts a claim in its third count for trademark infringement in violation of 15 U.S.C. § 1114(1) and a claim in its fourth count for unfair competition in violation of 15 U.S.C. § 1125(a).

The former statute on trademark infringement provides in relevant part:

> Any person who shall, without the consent of the registrant –
>
> **(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> **(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). The Sixth Circuit had held that "[i]n federal trademark infringement claims under 15 U.S.C. § 1114, the 'touchstone of liability ... is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.' " *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 355 (6th Cir. 1998) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir. 1997)). *See also PACCAR Inc.,* 319 F.3d at 249. The central focus is whether "the unauthorized use of a registered trademark when selling or

advertising a good or service using the trademark is likely to confuse or deceive consumers."

*U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir. 1997).

The latter statute referenced above, under which ATP's claim for unfair competition presumably falls, codifies § 43(a) of the Lanham Act. The statute provides in pertinent part:

> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Additionally, to the extent ATP might have intended to assert a state law claim for unfair competition, the Court notes that the analysis is the same. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) ("Because trademark claims under Ohio law follow the same analysis as those under the Lanham Act, our discussion of the federal trademark claims will therefore encompass the state trademark claims as well"); *Allard Enters., Inc. v. Advanced Programming Res.*, 146 F.3d 350, 354-55(quoting *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 754 (6th Cir. 1998)).

ATP moves for summary judgment on the grounds that Tdata's conduct has created a likelihood of confusion. In making this argument, the company relies in part on the initial

7

interest confusion doctrine. In response, Tdata asserts that the Sixth Circuit has not adopted this doctrine and directs this Court to an eight-pronged inquiry. The Court shall therefore begin its discussion with this doctrine.

For present purposes, it is enough to recognize that in 2003 the Sixth Circuit noted the existence of the initial interest confusion doctrine in *PACCAR, Incorporated v. Telescan Technologies, L.L.C.*, 319 F.3d 243. More recently, the Sixth Circuit revisited the doctrine in *Gibson Guitar Corporation v. Paul Reed Smith Guitars, LP*, 423 F.3d 539 (6th Cir. 2005). The *Gibson* panel explained that "[i]nitial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." *Id*. at 549. The appellate court cited *PACCAR* as "one case where [it] *arguably* ... applied initial-interest confusion" and characterized that case as one in which the court "*suggested* that initial-interest confusion analysis *might* appropriately be applied." *Id*. at 549, 550 (emphasis added). The *Gibson* court then clarified, however, that the *PACCAR* decision "did not rest on initial-interest confusion." *Id*. The Sixth Circuit nonetheless left the door open for applying the doctrine in Internet cases,[6] *id*. at 550 n.15, while emphasizing that the ultimate inquiry remained "whether the consumer might be misled about the source of the relevant product or service." *Id*. at 551.

In light of *PACCAR* and *Gibson*, this Court agrees in part with ATP insofar as the company asserts that the intitial interest confusion doctrine can apply in Internet cases, such as

---

[6] This Court sees no preclusive distinction between applying the doctrine in website domain-name cases as discussed by the Sixth Circuit in *Gibson* and metatag cases such as the instant litigation.

8

the instant litigation. Several other courts have recognized that the doctrine applies "when a confusingly similar designation is used in a hidden 'metatag,' on an Internet web site." Thomas McCarthy, *Trademarks and Unfair Competition* § 23:6 (4th ed.) (collecting cases). In *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999), for example, the Ninth Circuit addressed whether one company's use of another company's mark in metatags constituted infringement. The *Brookfield* court reasoned that the former company improperly trades on the goodwill of the latter company through use of the mark to draw in prospective consumers. *Id*. at 1062. It is the use of the mark to capture consumer interest or attention that is important.

After surveying numerous cases supporting this proposition, the Ninth Circuit provided this useful analogy:

> Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store. Suppose West Coast's competitor (let's call it "Blockbuster") puts up a billboard on a highway reading–"West Coast Video: 2 miles ahead at Exit 7"–where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. Nevertheless, the fact that there is only initial consumer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill.

*Id.* at 1064. The rationale applies to the instant litigation in which Tdata's use of ATP's mark–use resulting from the affirmative act of including the mark as a metatag–can only serve to bring to Tdata's website potential customers, some of whom might never have gone there but for

9

use of ATP's mark. The Court thus agrees with ATP that use of the company's mark in metatags constitutes infringing use of the mark to pull consumers to Tdata's website and the products it features, even if the consumers later realize the confusion. *See Victoria's Secret Stores v. Artco Equip. Co., Inc.*, 194 F. Supp. 2d 704, 729 (S.D. Ohio 2002). *See also Eli Lilly and Co. v. Natural Answers, Inc.*, 86 F. Supp. 2d 834, 845 (S.D. Ind. 2000) (holding that company's use of another company's mark in metatags was "an attempt to attract the attention of Internet surfers looking for information" about the product the mark represented).[7]

The Court also agrees in part with Tdata, however, which asserts that the initial interest confusion doctrine is applicable as but one part of a relevant eight-factor inquiry.[8] In other words–in the words of *Gibson*–"evidence of initial-interest confusion comes into the eight factor *Frisch* test as a substitute for evidence of actual confusion." *Gibson*, 423 F.3d at 550 n.15.

The eight factors that guide a likelihood-of-confusion inquiry include: (1) the strength of

---

[7] This decision was affirmed on appeal, although the reviewing court failed to credit application of the initial interest confusion theory in favor of examining actual prejudice. After finding no evidence of actual confusion, the court of appeals noted that such evidence is not essential to finding a likelihood of confusion. *Eli Lilly and Co. v. Natual Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000). The Seventh Circuit did, however, give significant weight to the inclusion of the mark in metatags as evidence of intent to deceive. *Id*. at 465-66 ("Because [the infringing company's] wrongful intent is so obvious, we weigh it heavily.").

[8] ATP argues that three "Internet trinity" factors dominate: the similarity of the marks, whether the parties are direct competitors, and the parties' simultaneous use of the Internet as a marketing channel. There is some support in the Ninth Circuit for this proposition. *See, e.g.*, *Interstellar Starship Servs., Ltd.*, 304 F.3d at 942 ("When this 'controlling troika,' or internet trinity, 'suggests confusion is ... likely,' the other factors must 'weigh strongly' against a likelihood of confusion to avoid the finding of infringement" (citations omitted)). Although the Sixth Circuit has noted the import the Ninth Circuit assigns to these "three most important factors," *PACCAR, Inc.*, 319 F.3d at 254-55, the Sixth Circuit has arguably not expressly adopted the Internet trinity approach as controlling. Because the three factors are subsumed in the traditional eight-factor approach, the Court assigns the former approach some persuasive–but not controlling–weight.

the plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion (or initial-interest confusion in this context); (5) marketing channels used; (6) likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792-93 (6th Cir. 2004); *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d at 1264; *Frisch's Restaurants, Inc.*, 670 F.2d at 648. None of these factors are singularly dispositive, as the appellate court has explained:

> These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case.... The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

*AutoZone, Inc.*, 373 F.3d at 793. *See also PACCAR Inc.,* 319 F.3d at 250. Thus, cognizant of the foregoing statutes and relevant case law, the Court turns to the core issue of whether a likelihood of confusion exists.

**Strength of ATP's mark.** The Sixth Circuit Court of Appeals has stated that "[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and, therefore, the more protection it is due." *Frisch's Restaurant, Inc.*, 759 F.2d at 1264. Further, as that court explained, " '[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.' " *Id*. (quoting Callmann, *Unfair Competition, Trademarks & Monopolies,* ¶ 20.43 (4th ed. 1983)). But even a finding that a strong mark is involved would not prove dispositive, because "the fact that a mark

11

is strong does not impact [a court's] analysis of the similarity of the marks, the relatedness of the products and services, or any of the other factors in the likelihood-of-confusion test." *AutoZone, Inc.*, 373 F.3d at 795.

No evidence supports that the "ATP" mark is either generic or merely descriptive. Rather, the Court recognizes that "ATP" is a valid, incontestable mark of some distinctiveness. It thus carries a consequent more likely degree of confusion resulting from infringement.

**Relatedness of the goods.** The Sixth Circuit has identified the criteria involved in the relatedness factor: "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely." *AutoZone, Inc.*, 373 F.3d at 797 (quoting *Kellogg Co. v. Toucan Golf, Inc.,* 337 F.3d 616, 624 (6th Cir. 2003)). Thus, the appellate court has explained, "[t]he relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Id.* (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (quotation omitted)).

The relatively meager evidence before the Court indicates that at least on some products ATP and Tdata are direct competitors, although the focus of each company's full line of products is varied and includes other disparate products. There is nonetheless sufficient evidence of competition and of similarity in regard to specific products to support a degree of likely confusion.

**Similarity of the marks.**  The Sixth Circuit has held that "in reviewing the similarity of marks the commercial context must be considered. ... '[I]t is the effect upon prospective purchasers that is important.' "  *Frisch's Restaurant, Inc.*, 759 F.2d at 1266 (quoting *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir. 1979)).  This inquiry does not involve a simple comparison.  Rather, the Sixth Circuit has explained:

> "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." [*Daddy's Junky Music Stores, Inc.,* 109 F.3d at 283.]  A side-by-side comparison of the litigated marks is not appropriate, although naturally the commonalities of the respective marks must be the point of emphasis.  Instead, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark."  *Id.* (quotations omitted).

*AutoZone, Inc.*, 373 F.3d at 795.  Here, it is beyond dispute that the "ATP" mark used by each party is indistinguishable.

**Actual confusion.**  The Court has already discussed above initial interest confusion.

**Marketing channels used.**  This factor is concerned with " 'the parties' predominant customers and their marketing approaches.  Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases.' "  *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Therma-Scan, Inc.,* 295 F.3d at 636).  Here, the evidence indicates that although both parties market product through various methods, one component, but not the exclusive component, of that marketing is through the Internet.  The evidence indicates that ATP has had a web presence since at least 1996 and that Tdata has had a web presence since at least 1997.

**Likely degree of purchaser care.**  In evaluating this factor, the Court is cognizant that "

13

'the standard used by the courts is the typical buyer exercising ordinary caution.' " *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 285 (6th Cir.1997)). ATP asserts that this factor is "likely neutral" in that while the products and services the parties sell are not over-the-counter, low-dollar purchases, there is also no evidence targeting the sophistication of the purchasers. (Doc. # 99, at 10.) Tdata disagrees, asserting in its memorandum in opposition that it is settled that purchasers in the market exercise a high degree of care.

Presumptively, Tdata is correct–or at least one hopes so–but neither party directs this Court to any actual evidence in the record on this issue. The unusual nature of the purchases involved here weigh in favor of concluding that the purchasers are presumably relatively sophisticated consumers who exercise a commensurate degree of care in making their purchases. This would diminish *somewhat* the likelihood of confusion. But the Court cautions that (1) the similarity of the marks employed decreases the significance of this factor considerably, and (2) even a sophisticated buyer knowledgeable about a product may nonetheless incorrectly presume company affiliations where none exist. *See Therma-Scan, Inc.*, 295 F.3d at 638. Accordingly, the Court concludes that this factor is ultimately of minimal significance.

**Tdata's intent in selecting the mark.** The Sixth Circuit has explained that "[i]f a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.' " *Therma-Scan, Inc.*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores,* 109 F.3d at 286 (citation omitted)). Thus, "[c]ircumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an

14

inference of intentional infringement where direct evidence is not available." *Id*. at 638-39 (quoting *Daddy's Junky Music Stores,* 109 F.3d at 286).

There is no direct evidence here that Tdata chose to use the "ATP" mark with the intention of creating confusion between its products and ATP's product. Necessarily crediting as true the evidence that Tdata president James Thomas became aware of the use of "ATP""some time prior to June of 2000" and removed what he (incorrectly) believed to be all of the ATP metatags from the company webpage, the Court nonetheless notes that there is also evidence that Tdata has since employed "ATP" in various formulations on its website.[9] (Doc. # 112, Ex. A, Thomas Decl. at 2 ¶ 6-7; Doc. # 101, Ex. 5, at 1.) There is also the notable factor that Tdata used the mark as a metatag, as opposed to simply on the website in a products-comparison chart, for example; the hidden-from-public-eye use of the mark lends itself to an inference disfavoring Tdata.

There is thus some circumstantial evidence favoring ATP. This evidence of the intent to use the mark, despite the lack of direct evidence of infringement with intent to deceive, means that this factor carries notable but not dispositive weight and in determining whether consumers will likely be confused here. Rather than deeming this factor largely irrelevant, *see Therma-Scan, Inc.*, 295 F.3d at 639 (citing *Daddy's Junky Music Stores,* 109 F.3d at 287), the Court concludes that "the circumstantial evidence shows [Tdata] had knowledge of the [infringed upon] mark when they used it in ... metatags to attract Internet search engines. No rational trier of fact could draw an inference to the contrary." *Victoria's Secret Stores*, 194 F. Supp. 2d at

---

[9] ATP attacks Thomas' declaration statements as fabrications punctured by evidence that the mark was changed from "www.atp.com" to "atp" in the metatags. (Doc. # 99, at 11.) Given the conflicting inferences that the evidence produces, there is thus a factual dispute on the issue.

728.

**Likelihood of expansion of the product lines.** The Sixth Circuit "has explained that although evidence that either party will likely expand its product lines supports finding a likelihood of confusion, '[a] finding that the parties will not expand their marks significantly ...does not address the ultimate issue of likelihood of confusion.' " *Therma-Scan, Inc.*, 295 F.3d at 639 (quoting *Daddy's Junky Music Stores,* 109 F.3d at 287) (internal quotation marks and citation omitted)). This Court recognizes that the evidence on either parties' expansion plans is generally inconclusive. ATP deems this factor "largely irrelevant" (Doc. # 99, at 11), and Tdata's memorandum in opposition ignores the factor. The Court assigns little weight to this last factor in favor of either side. *See Victoria's Secret Stores*, 194 F. Supp. 2d at 728 ("The parties already directly compete in selling lingerie over the Internet. Therefore, the Court finds the issue of expansion into competing product lines irrelevant to this analysis.")

Tdata posits that, regardless of the merits of the foregoing factors, they cannot prove dispositive for three reasons. Tdata first asserts that the doctrine of unclean hands precludes ATP from prevailing on its trademark claims. The company reasons that ATP failed to act in good faith by failing to provide notice to the public by marking its products in accordance with 35 U.S.C. § 287(a).

This theory fails because, as ATP notes in its reply memorandum, Tdata has failed to produce *any* evidence whatsoever as to what products it is referencing. It is well settled that a party cannot rely on such bare, unsupported allegations to evade summary judgment, but must instead produce specific evidence. *Hamilton v. Roberts*, 165 F.3d 27, 1998 WL 639158, at *5 (6th Cir. 1998) (unpublished table decision). It is also clear that this Court need not scour the

16

record to uncover any such evidence. *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). Moreover, Tdata has failed to explain how the purported failure to mark products for patent purposes provides an equitable defense to trademark infringement claims.

Tdata also argues that its use of ATP's mark falls under the scope of reasonably necessary comparative use under the fair use or nominative fair use defenses.[10] Tdata certainly need not show an absence of likely confusion to use the fair use defense. *KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004). But as ATP points out, Tdata's use of the mark *as a metatag* does not simply and fairly refer to ATP's products. Even assuming that Tdata can assert the defenses, the defenses do not carry the day because Tdata's use of ATP's mark in metatags is not in a good faith, descriptive sense, but is in a bad faith, bait-and-switch, create-initial-confusion sense. *See Victoria's Secret Stores*, 194 F. Supp. 2d at 725.

Finally, Tdata contends that the doctrine of laches prevents ATP from prevailing on its trademark infringement claims to the extent they occurred prior to the filing of this litigation. Tdata states:

> ATP reports Tdata first used its trademark in a metatag on or about January 13, 1998. Yet, ATP did not contact Tdata about the use of the trademark until filing suit on April 29, 2004, more than six years later, and more than four years after the running of the statute of limitations for an action for injury to personal property.

---

[10] Tdata asserts both theories in its motion for summary judgment, but the company curiously focuses only on the free demo CD offer page use of the mark. (Doc. # 130, at 8-11.)

(Doc. # 112, at 13.)  But as ATP points out, this argument fails to direct this Court to any evidence indicating that Tdata's factual inference that ATP knew of its claims but failed to assert them in a timely manner is correct.

Both motions for summary judgment therefore turn on application of the eight-factor test discussed above.  The trademark aspect of this litigation boils down to whether Tdata is improperly trading or traded on a mark held by ATP.  The use of "ATP" as a metatag suggests that Tdata's actions were, in the words of the Sixth Circuit, "nefarious."  *See Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 698 n.7 (6th Cir. 2003) (noting that the record did not reveal that defendants, who prevailed on summary judgment, had done anything to bias a search engine, such as using its competitors mark as a metatag).  Thus, taking all of the foregoing factors into account, the Court concludes that the significant weight of the factors considered indicate that consumer confusion is likely to occur.[11]  No reasonable juror could conclude that this does not result from trademark infringement and unfair competition.  Accordingly, based on the limited evidence before the Court,[12] the Court concludes that ATP is entitled to summary judgment on its two trademark claims, while Tdata is not entitled to

---

[11] The factual disputes that exist are not over material facts insofar as the weight of the factors involving undisputed facts proves dispositive.

[12] The Court recognizes that much of Tdata's motion for summary judgment depends upon a flawed "declaration" by Laura Thieme, which the Court necessarily struck in a January 13, 2006 Order.  (Doc. # 188.)  Having reviewed the declaration contents when searching for its required features and in light of the now-unsupported arguments contained in Tdata's briefing, the Court recognizes that Tdata's no-likelihood-of-confusion argument is without substance.  Additionally, to the extent the company's stricken material relied on actual website "hits," the Court notes the precarious nature of this argument.  *See Interstellar Starship Servs., Ltd.*, 304 F.3d at 945 n.10 ("we find largely irrelevant what results when a given term is input into a search engine.  Our initial interest confusion analysis does not depend on a given business's payment or lack thereof to the various search engines.").

judgment as a matter of law.[13]

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** ATP's motion for summary judgment (Doc. # 99) and **DENIES** Tdata's motion for summary judgment (Doc. # 130).[14]

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

---

[13]  Tdata's motion for summary judgment and supporting brief is a recast version of its memorandum in opposition to ATP's summary judgment motion.  Although portions of Tdata's supporting memorandum is often a word-for-word representation of its earlier filing, the memorandum in support does contain notable revisions and additions.  The Court has considered Tdata's motion and its related briefing distinctly on their own merits.

[14]  The Clerk is instructed to record these decisions in 2:04-cv-1072 as well.  (Docs. # 78, 108.)