## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TDATA INC.**

    **Plaintiff,**      **Case No. 2:03-cv-264**
                **JUDGE GREGORY L. FROST**
  **v.**            **Magistrate Judge Terence P. Kemp**

**AIRCRAFT TECHNICAL PUBLISHERS,**

    **Defendant.**


**AIRCRAFT TECHNICAL PUBLISHERS,**

    **Plaintiff,**      **Case No. 2:04-cv-1072**
                **JUDGE GREGORY L. FROST**
  **v.**            **Magistrate Judge Terence P. Kemp**

**TDATA INC.**

    **Defendant.**

### OPINION AND ORDER

This matter is before the Court for consideration of a motion for summary judgment (Doc. # 170) filed by Aircraft Technical Publishers ("ATP"), a supporting declaration (Doc. # 171) filed by ATP, a memorandum in opposition (Doc. # 176) filed by Tdata Incorporated ("Tdata"), and a reply (Doc. # 181) filed by ATP.[1]  For the reasons that follow, the Court **GRANTS** ATP's motion for summary judgment.

### I.  Background

---

[1]  For ease of reference, the Court shall refer to the document numbers in Case No. 2:03-cv-264.  This Order also targets the corresponding documents filed in Case No. 2:04-cv-1072.

In several prior Orders, this Court has described the nature and circumstances of this consolidated litigation.  For purposes of the record, the Court shall once again briefly describe here the essential facts of this litigation.

Tdata Incorporated ("Tdata") is a company that produces and sells a software product called "Iapproach," which is a resource used for managing aircraft maintenance and repair.  Aircraft Technical Publishers ("ATP") is the holder of three patents that are involved in these two consolidated cases.  The companies became embroiled in a dispute over these patents, and on March 27, 2003, Tdata filed case No. 2:03-cv-264 in this Court, seeking to invalidate two of the patents.  ATP filed a counterclaim asserting infringement of these same patents.

Various procedural developments ensued while ATP proceeded to file a second action–this one targeting the remaining third patent–in the United States District Court for the Northern District of California.  By then, the parties' dispute also encompassed alleged trademark infringement by Tdata.  Following much procedural maneuvering both in this Court and in the Northern District of California, which included an order of transfer that created case No. 2:04-cv-1072, both actions were eventually consolidated on this Court's docket before the undersigned judge.

In an effort to clarify and focus these proceedings, the Court permitted ATP to file an Amended Complaint on December 7, 2004.  (Doc. # 60.)  That amended pleading asserted four claims: willful patent infringement, patent infringement, trademark infringement, and unfair competition.  (Doc. # 60, at 5-11.)  Tdata in turn filed a January 6, 2005 answer containing two counterclaims, the first of which asks for declaratory relief, while the second counterclaim asserts an antitrust violation asserting that ATP had violated antitrust laws by attempting to

2

unlawfully restrain trade, by attempting to fix prices, and by attempting to enforce an invalid patent in an effort to create a monopoly.  (Doc. # 66, at 9 ¶¶ 40-46.)  ATP filed a reply to the counterclaims on January 21, 2005.  (Doc. # 70.)  The consolidated actions thus present three basic causes of action: patent infringement, trademark infringement, and antitrust.  The motion with which this decision is concerned addresses only the antitrust counterclaim.

Tdata bases the attempted price fixing portion of its antitrust counterclaim on a telephone conference between ATP CEO Caroline Daniels and Tdata President James Thomas.  Tdata alleges that Daniels "attempted to coerce Tdata to raise its prices to the range of ATP."  (Doc. # 66, at 9 ¶ 41.)  Although Thomas purportedly refused to raise Tdata's prices, Tdata alleges that ATP's negotiations were, nonetheless, intended to create similar prices between Tdata's and ATP's products.  (Doc. # 66, at 9 ¶¶ 42, 46.)  Tdata alleges that this attempt to coerce Tdata to raise its prices is an unlawful attempt to restrain trade and fix prices in violation of unidentified "Federal and State Anti-trust laws."[2]  (Doc. # 66, at 9 ¶¶ 43-44.)

Although the parties agree that the telephone conference at issue occurred as part of settlement discussions, they disagree as to the admissibility of any statements made in connection therewith. Tdata also classifies ATP's actions in attempting to enforce a patent that it deems invalid as an effort to create a monopoly in violation of antitrust laws by way of a "sham litigation."  (Doc. # 66, at 9 ¶ 45.)  ATP has moved for summary judgment on the antitrust counterclaim, and the motion is now ripe for disposition.

---

[2] As noted, Tdata's pleading does not identify with specificity the federal and state laws under which it is proceeding, and the company's briefing ignores any specific state antitrust laws.  Accordingly, the Court assumes that either Tdata has abandoned its state claims or that these claims track federal law so that the analysis of the company's federal antitrust allegations resolves its state antitrust allegations.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment here if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to his case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52.)

### B. Analysis

As noted, Tdata alleges in its second counterclaim that ATP CEO Daniels attempted to coerce Tdata to raise its prices to the range of ATP's in a telephone conference with Tdata President James Thomas.  (Doc. # 66, at 9 ¶ 41.)  ATP has responded to this allegation by asserting that the counterclaim fails to state a viable antitrust violation and that there is no injury. The company also asserts that the telephone conversation is a part of inadmissible settlement discussions.  This Court shall address each theory in turn, beginning with the threshold issue of admissibility.

### i.  Privileged Settlement Communications

Prior to entering into settlement negotiations, ATP and Tdata entered into an agreement that Federal Rule of Evidence 408 would govern any discussions between them.  Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.  This rule does require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.  This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.  ATP asserts that because Tdata's second counterclaim is based largely on the recorded telephone conference between Daniels and Thomas regarding the settlement of the underlying patent infringement claim, any evidence taken from that conversation is inadmissable.

The Sixth Circuit has explained, however, that "[a]lthough the literal language of Rule

5

408 broadly declares that '[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible,' courts have held that Rule 408 is . . . inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions." *Uforma/Shelby Business Forms, Inc. v. National Labor Relations Board*, 111 F.3d 1284, 1293 (6th Cir. 2001). Thus, " 'wrongful acts are not shielded because they took place during compromise negotiations.' " *Id.* (quoting 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure*, Evidence § 5314 (1st ed. 1980)). The Court therefore agrees with Tdata that the telephone conversation between Daniels and Thomas is admissible for the purpose of the motion under consideration.[3]

### ii. Attempted Price Fixing

Tdata alleges that the Daniels-Thomas telephone conference presented an attempt at price fixing and an unlawful restraint of trade in violation of Federal and State antitrust laws. In response to Tdata's generally ambiguous pleading–which conflates distinct concepts in one counterclaim–ATP notes that Tdata has failed to allege any injury.

To support this contention, ATP points to the deposition of Tdata's president, in which the following exchange occurred:

> Q.     Did you make some agreement during that call with Miss Daniels to set your prices at some level or otherwise fix your prices?
> A.     I  - - I did not make an agreement.

---

[3] ATP's alternative argument that the pre-negotiation agreement would preclude consideration of the telephone conversation, apart from Rule 408, similarly fails because the purported offer to enter into illegal conduct does not comprise settlement negotiations. The Court realizes, however, that the point is ultimately moot given the subsequent disposition of Tdata's second counterclaim.

Q.     Did you raise your prices as a result of that phone call with Miss Daniels?

A.     No.

(Thomas Dep. at 62.)  Therefore, Tdata has admitted that there was no agreement to fix prices.

It is an axiomatic principle of standing that no case may be had without injury-in-fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Further, without an antitrust injury, "no private antitrust action will lie at law or in equity."  *Valley Products Co., Inc. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997).  Antitrust injury must be alleged even where alleged acts of defendant constitute a per se violation of antitrust laws.  *Pace Electronics, Inc. v. Canon Computer Systems, Inc.*, 213 F.3d 118, 120 (3rd Cir. 2000); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341 (1990).   In order to have antitrust standing "[a] private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause must allege ... 'antitrust injury.' " *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 909 (6th Cir. 2002) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). " 'Antitrust injury' is (1) 'injury of the type the antitrust laws were intended to prevent' and (2) injury 'that flows from that which makes defendants' acts unlawful.' " *Id*. (quoting *Brunswick*, 429 U.S. at 489).  The Supreme Court has further explained the requirement of proving an antitrust injury as "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic,* 495 U.S. at 344.   "Courts must therefore find an allegation of cognizable antitrust injury in the complaint in order to avoid the real possibility that the antitrust action could itself have anticompetitive consequences." *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 346 (6th Cir. 2006).

In analyzing the question of antitrust injury, the Court starts from the premise that

"antitrust laws were enacted for the protection of competition, not competitors." *Brunswick*, 429 U.S. at 488. Tdata has admitted that there was never any agreement between the two parties to fix prices, nor did any prices change as a result of their communications. Even if Tdata made the allegation in its counterclaim that some sort of injury was proximately caused by ATP's actions, which it does not, it still could not prove any antitrust injury. Even if there was some cognizable injury that proximately arose from ATP's actions, there was never any effect whatsoever on competition because by Tdata's President's own admission, nothing changed as a result of their communications:

> Q.      Right. So you didn't lose any business as a result of this phone call. Nothing changed. You went about your business just as you had gone about your business before; right?
> A.      Prices stayed the same.

(Thomas Dep. at 321-22.) Thus, Tdata fails to point to any evidence suggesting that the purported attempted price fixing harmed it, much less competition as a whole.

Tdata has therefore not suffered an antitrust injury as a result of the alleged attempt to fix prices. Additionally, Tdata has neither alleged nor proven any injury-in-fact as a proximate result of the alleged attempt to fix prices (and thereby unlawfully restrain trade). Based on the foregoing, this Court is inclined to agree with ATP that Tdata has not suffered an antitrust injury and consequently does not have antitrust standing to bring suit.[4]  *See Rickbit Indus., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1547-49 (S.D. Texas 1991); *Anesthesia Advantage, Inc. v. Metz*

---

[4]  In reaching this conclusion, the Court neither adopts nor rejects ATP's underlying contention that attempted price fixing of the sort alleged here is intrinsically invalid. Other courts have apparently considered attempted price fixing as a potentially viable cause of action.

*Group*, 759 F. Supp. 638, 645-46 (D. Colorado 1991); *Disenos Artisticos E Industriales v. Karen-Leslie Co., Inc.,* 676 F. Supp. 1254, 1279-80 (E.D. N.Y. 1987).

Even assuming arguendo that Tdata does have antitrust standing, its second counterclaim still fails. To the extent that the pleading and briefing can be read to mean that the purported attempted price fixing was an attempt at monopolization, the Court recognizes that as a matter of law ATP is entitled to judgment.

Both parties agree that in order to establish a claim for attempted monopolization, a plaintiff must establish (1) anti-competitive or predatory conduct, (2) a specific intent to act in an anti-competitive manner, and (3) dangerous probability of success. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993). In *Richter Concrete Corporation v. Hilltop Concrete Corporation*, 691 F.2d 818 (6th Cir. 1981), the Sixth Circuit discussed the relationship between market share and dangerous probability of success: "The greater a firm's market power the greater the probability of successful monopolization. In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power – the ability to control prices and exclude competition. Market strength is often indicated by market share." *Id.* at 826. *See also MacNealy v. Dayton Osteopathic Hospital, Inc.*, No. C-3-88-402, 1993 WL 1377513, at *4 (S.D. Ohio Mar. 3, 1993).

The *Richter* court concluded that a market share that had declined from 40% to 30% did not establish a dangerous probability of success. *See Richter*, 691 F.2d 818. Furthermore, the Sixth Circuit has explained "that it would be rare indeed to find that a firm with only 25 percent or 50 percent of the market could control price over any significant period." *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432 (6th Cir. 1990). Other courts are in

9

accordance with this view.  *See United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976)

(50% market share does not establish dangerous probability of success); *Lektro-Vend Corp. v.*

*Vendo Co.*, 660 F.2d 255 (7th Cir. 1981) (30% market share is not enough).

Here, Tdata has presented little evidence going toward the strength of ATP's market

share.  The only evidence before the Court is insufficient under prevailing precedent to establish

a dangerous probability of success:

> Q.      And in [the general aviation maintenance market], how much average
> percentage of the market do you think [Tdata has] at this point with your 3,500
> plus customers?
>
> A.      It's a guess.  I think maybe more than 35 percent.
>
> Q.      And who do you think has the remaining 65 percent of the market?
>
> A.      Well, Avantex is the other player, and I think they may have 30 percent.
>
> Q.      And what's your belief as to what percentage of the market ATP has?
>
> A.      Well, maybe the remainder.  I'm not sure exactly.  I know we have more
> U.S. customers than either of those companies.

(Thomas Dep. at 142.)

Such evidence of ATP's market share is legally insufficient to establish a dangerous

probability of success.  If Tdata holds roughly 35 percent of the market and Tdata has more

customers than ATP, then ATP has *less than 35 percent* of the market share.  Therefore, in

accordance with Sixth Circuit precedent, ATP's market share cannot establish the dangerous

probability of monopolization element.  Moreover, no agreement was ever reached and even if

ATP did have the requisite market share, the only way that ATP could possibly succeed in any

anticompetitive activity would be if Tdata's will was some how overcome and they begrudgingly

agreed to fix prices.  *See Bailey's Inc. V. Windsor America, Inc.*, 948 F.2d 1018, 1030 (6th Cir.

1991) (" 'in order to conspire to restrain retail price competition there must be some agreement to set, control, fix, maintain, or stabilize prices' " (citation omitted)).

Based on the foregoing, the Court concludes that the evidence of market share is not only insufficient, but does not raise a genuine issue of material fact as to whether ATP had a dangerous probability of successfully monopolizing the general aircraft maintenance market. On the contrary, the sparse evidence of market share establishes as a matter of law that ATP did not have sufficient market power to constitute a dangerous probability of successfully creating a monopoly.

### iii. Sham Litigation

ATP is the holder of three patents. ATP and Tdata became embroiled in a dispute over these patents, and on March 27, 2003, Tdata filed case No. 2:03-cv-264 in this Court, seeking to invalidate two of the patents. ATP filed a counterclaim asserting infringement of these same patents. Tdata now alleges that ATP's assertion of infringement is actually an effort to create a monopoly in violation of antitrust laws by way of a "sham litigation."

ATP contests that Tdata has actually asserted sham litigation in its second counterclaim. To the extent that the inartfully pled counterclaim can be liberally read to assert such a theory,[5] the Court does so. (Doc. # 66, at 9 ¶ 45 ("ATP's actions in attempting to enforce an invalid patent are an effort to create a monopoly in violation of anti-trust laws").) The Court concludes,

---

[5] Similarly, Tdata's memorandum in opposition presents this Court with a litany of largely irrelevant claimed wrongs by ATP, such as an alleged breach of contract, that do not speak to the substance of the second counterclaim and the summary judgment motion actually before the Court. Because the Court has disregarded that which is not relevant or that which is factually incorrect regarding what the Court has already held in addressing the motion *sub judice*, ATP's evidentiary objections are **MOOT**. (Doc. # 182.)

however, that no reasonable juror could find in favor of Tdata on this theory.

Under the *Noerr-Pennington* doctrine, genuine attempts to petition the government to enforce laws are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts.  *United Mine Workers v. Pennington*, 381 U.S. 657, 669-71 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-39 (1961).  An exception to the *Noerr-Pennington* doctrine exists, however, where a party attempts to influence the government or the courts to enforce a claim that is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *Westmac, Inc. v. Smith*, 797 F.2d 313, 315 (6th Cir. 1986) (quoting *Noerr*, 365 U.S. at 144)).  The Sixth Circuit has distinguished between an anticompetitive purpose, which the *Noerr Pennington* doctrine does protect, and the purpose to harm competitors not by the ultimate result of the litigation, but by the simple fact of the institution of the litigation.  *Id.* at 316-17.  Further, the Sixth Circuit has also held that the "sham exception" is a narrow one and that "when a lawsuit raises a legal issue of genuine substance, it raises a rebuttable presumption that it is a serious attempt to obtain a judgment on the merits instead of a mere sham or harassment."  *Id*. at 318.

The United States Supreme Court has outlined a two-part definition of sham litigation:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," through the "use [of] the governmental process – as opposed to the

12

*outcome* of that process – as an anticompetitive weapon."

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)

(citations omitted).  Thus, for ATP's pleading to violate the antitrust laws, it must be a sham both

objectively and subjectively.

The Court begins with whether a reasonable litigant could realistically expect success on

the merits of ATP's infringement claim.  This claim–initially a counterclaim–easily satisfies the

requisite standard.  In contending otherwise, it appears that Tdata has failed to consider a basic

tenet of patent law: "A patent shall be presumed valid."  35 U.S.C. § 282;  *see also Stewart-*

*Warner Corp. v. Pontiac, Michigan*, 717 F.2d 269, 276 (6th Cir. 1983).  Furthermore, Congress

specifically granted patent owners the right to commence a civil suit to protect their inventions.

35 U.S.C. § 281.  Accordingly, regardless of whether ATP intended any predatory or

monopolistic purpose in filing its counterclaim, it has statutory patent rights that it may seek to

protect via litigation.

Additionally, the Supreme Court has held that "the existence of probable cause to

institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham

litigation."  *Professional Real Estate*, 508 U.S. at 62.  "Probable cause to institute civil

proceedings requires no more than a reasonable belief that there is a chance that [a] claim may be

held valid upon adjudication." *Id.* (internal quotation marks omitted).  Accordingly, the

presumption of validity of patents provides ATP with a reasonable expectation that its patent

infringement counterclaim may be held valid upon adjudication and Tdata has produced no

evidence to rebut such a presumption.

Furthermore, a finding of objective baselessness here is unfounded for the additional

13

reason that it was Tdata that commenced litigation against ATP when it filed case No. 2:03-cv-264 in this Court, seeking to invalidate two of ATP's patents.  In fact, ATP's then-counterclaim was a compulsory counterclaim under Fed. R. Civ. P. 13(a).  Had ATP failed to bring its counterclaim it may have very well lost its ability to protect its patents against infringement in the future.

In light of the foregoing, the Court concludes that ATP's objectively reasonable effort to litigate cannot be a sham regardless of whatever subjective intent the company may hold.  *See Professional Real Estate*, 508 U.S. at 57.  Tdata's underlying assumption in its memorandum in opposition–that because the ultimate validity of the patents remains at issue, summary judgment is inappropriate–misses the foregoing point.  Accordingly, the Court must conclude that ATP is entitled to summary judgment on the "sham litigation" aspect of the second counterclaim.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** ATP's motion for summary judgment on Tdata's second counterclaim.  (Doc. # 170 in 2:03-cv-264; Doc. # 147 in 2:04-cv-1072.)

**IT IS SO ORDERED.**

                                  /s/   Gregory L. Frost
                                GREGORY L. FROST
                                UNITED STATES DISTRICT JUDGE